IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| WILLIAM SCHAEFFNER, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-424-ST |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| PACIFIC TERMINAL SERVICES, INC. and | ) | |
| TROY GOODMAN, | ) | |
| | ) | |
| Defendants. | ) | |

STEWART, Magistrate Judge:

**INTRODUCTION**

Plaintiff, William Schaeffner, originally filed this action on January 30, 2004, in

Multnomah County Circuit Court, *Schaeffner v. Pacific Terminal Services, Inc. and Troy*

*Goodman*, Case No. 0401-01028.  Schaeffner alleges a claim for breach of contract against his

former employer, Pacific Terminal Services, Inc. ("PTS"), and a claim for intentional

interference with economic relations against his former supervisor and manager at PTS, Troy

Goodman ("Goodman").  On March 24, 2004, defendants filed a Notice of Removal to this court, alleging jurisdiction based on diversity of citizenship under 28 USC § 1332.

Now before the court is defendants' Motion for Summary Judgment (docket #11).  For the reasons that follow, that motion should be granted against the Second Claim for Relief, and denied against the First Claim for Relief.

## STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial.  *Id* at 324.  A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts in the light most favorable to the non-moving party.  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *Id* at 630-31.  However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required.  *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988), citing *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 US 574 (1986). The Ninth Circuit has stated, "No longer

can it be argued that any disagreement about a material issue of fact precludes the use of

summary judgment." *Id.*

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant,

this court will view the evidence in the light most favorable to Schaeffner. A review of the

available evidence[1] reveals the following:

PTS operates an oil terminal on the Willamette River in Portland. It supplies

intermediate fuel oils and residual fuel oils to customers that are transported to the facility by

trucks and barges. The fuel oils are contained in five holding tanks on the property. The facility

also has a warehouse, an office, and a testing facility. The facility generally operates 24 hours a

day, seven days a week, and normally an operator works a shift by himself.

Schaeffner had worked for PTS's predecessor company, Northern Oil, for a number of

years prior to the acquisition of the facility in 1999 by PTS. Schaeffner was employed by PTS

from 1999 until his termination as an Operator I.

The Inlandboatmen's Union of the Pacific, Columbia River Region ("Union"), was the

exclusive bargaining representative for PTS operators. A collective bargaining agreement

("CBA") between the Union and PTS was in effect between 1999 and May 31, 2003, at which

time that CBA lapsed.

---

[1] Excerpts from affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript. Deposition exhibits are referenced by their exhibit numbers.

Late in 2000, Schaeffner was selected for a random drug test pursuant to PTS's drug and alcohol policy and tested positive for marijuana. Schaeffner was initially suspended and then terminated over the positive drug test.

Schaeffner filed a grievance with his Union over his termination. The grievance was processed up to a joint labor relations committee, where a settlement was negotiated between PTS, the Union, and Schaeffner. Part of this settlement was a Last Chance Agreement ("LCA") which Schaeffner signed on December 13, 2000. Schaeffner Depo Ex 6.

The LCA allowed Schaeffner to reapply for employment within 60 days, and required him to strictly comply with several conditions, including that he participate in a substance abuse rehabilitation or treatment program and a follow-up treatment program, agree to random drug testing, and refrain from the use of all non-medically prescribed controlled substances. *Id* at 1-2. Upon rehire, Schaeffner was subject to a 60 month probationary period during which he was required to submit to periodic drug testing and "[m]aintain satisfactory job performance, conduct, and attendance." *Id* at 1.

About two and a half years after Schaeffner signed the LCA and was rehired by PTS,[2] the CBA between the Union and PTS expired. Two months later, on July 23, 2003, Schaeffner was working a night schedule for another employee on vacation. Schaeffner was the only operator scheduled for that shift which ran from approximately 11:00 p.m. to 7:00 a.m. the following morning. At about 5:45 a.m. on the morning of July 24, 2003, Goodman arrived at the facility and came into the control room, where he found Schaeffner lying down on some chairs that he

_____

[2] Although the record does not contain any documentation of Schaeffner's rehire by PTS, there does not appear to be any dispute that Schaeffner "complied with the LCA for a period of 31 months." Arbitration Decision, p. 3.

had put together. Schaeffner sat up and had a discussion with Goodman about the duties that

Schaeffner was supposed to have performed that evening from the supervisor's to-do list.

Schaeffner and Goodman then left the control room to look at areas that had items on the to-do

list. During this time a truck arrived for a fuel pickup and Schaeffner left to handle the truck.

At the end of the shift, Goodman called Schaeffner in and accused him of sleeping on the

job. Goodman also questioned whether or not Schaeffner had completed some of the tasks that

had been left by the supervisor. PTS employees are not allowed to sleep on the job even during

a break. Sleeping on the job would have been a serious violation of PTS policy. However,

Schaeffner contends that he was not sleeping on the job, but was only resting during a break

period.

On July 30, 2003, Schaeffner was terminated for sleeping on the job. Goodman Depo,

Ex 14. The Union then initiated an arbitration on behalf of Schaeffner pursuant to a provision in

the CBA which required the arbitration of grievances involving "the interpretation or application

of [the CBA]." Keaney Affidavit, Exhibit B ("Arbitration Decision"), p. 2. Specifically, the

Union contended that PTS violated Article 6.2 of the expired CBA which precluded the

discharge of bargaining unit employees "without just cause." *Id* at 9. However, on

December 19, 2003, the arbitrator concluded that PTS could not be compelled to arbitrate

Schaeffner's discharge due to the expiration of the CBA between PTS and the Union. The

arbitrator therefore canceled the arbitration hearing and dismissed the grievance.

Schaeffner filed the instant lawsuit six weeks later.

///

///


5 - FINDINGS AND RECOMMENDATION

## DISCUSSION

The First Claim for Relief alleges that PTS breached the terms of the LCA by terminating

Schaeffner based upon Goodman's false statements that he had been sleeping on the job. The

Second Claim for Relief alleges that Goodman intentionally interfered with Schaeffner's

contractual relationship with PTS (pursuant to the terms of the LCA). Specifically, Schaeffner

alleges that Goodman caused PTS to terminate him based upon the false accusation that he was

sleeping on the job.

Defendants contend that both claims are preempted under federal labor law. In addition,

PTS contends that because Schaeffner was an at-will employee, he cannot bring a claim for

breach of the LCA. Finally, Goodman asserts that Schaeffner has failed to state a *prima facie*

case under Oregon law for intentional interference with economic relations.

## I. Preemption

Defendants contend that both claims are preempted under § 301 of the federal Labor

Management Relations Act ("LMRA"), 29 USC § 185(a).[3] This court disagrees and therefore

recommends that, to the extent it is premised on a preemption argument, defendants' motion

should be denied.

### A. Legal Standard

The LMRA "governs claims founded directly on rights created by collective-bargaining

agreements and also claims substantially dependent on analysis of a collective-bargaining

---

[3] 29 USC § 185(a) provides:
> Suits for violations of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce as defined in this chapter, or
> between any such labor organizations, may be brought in any district court of the United
> States having jurisdiction of the parties, without respect to the amount in controversy or
> without regard to the citizenship of the parties.

agreement." *Caterpillar, Inc. v. Williams*, 482 US 386, 394 (1987) (internal quotations and citation omitted).

Section 301 of the LMRA is designed to serve a three-fold purpose, namely to: (1) grant federal courts jurisdiction over claims asserting breaches of collectively bargained agreements; (2) authorize the development of federal common law rules of decision and thereby assure that agreements to arbitrate grievances would be enforced; and (3) assure that federal common law, rather than state contract law, governs the interpretation of terms in collectively bargained agreements. *Livadas v. Bradshaw*, 512 US 107, 121-22 (1994).

The LMRA does not preempt "nonnegotiable rights conferred on individual employees as a matter of state law." *Id* at 123. Instead, preemption only occurs when resolution of the state claim "is inextricably intertwined with consideration of the terms of the labor contract," *Allis-Chalmers Corp. v. Lueck*, 471 US 202, 213 (1985), or when application of state law to a dispute "requires the interpretation of a collective bargaining agreement," *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 US 399, 413 (1988). In short, [a] state law claim is not preempted under § 301 unless it necessarily requires the court to interpret an existing provision of the CBA that can reasonably be said to be relevant to the resolution of the dispute." *Cramer v. Consolidated Freightways, Inc.*, 255 F3d 683, 693 (9th Cir 2001), *cert denied*, 534 US 1078 (2002).

Preemption "is more than jurisdictional" in that "it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 US 448, 450-51 (1957).

> The full scope of the pre-emptive effect of federal labor-contract
> law remains to be fleshed out on a case-by-case basis. We do hold
> that when resolution of a state-law claim is substantially dependent
> upon analysis of the terms of an agreement made between the
> parties in a labor contract, that claim must either be treated as a
> § 301 claim . . . or dismissed as preempted by federal
> labor-contract law.

*Allis-Chalmers Corp.*, 471 US at 220 (internal citation omitted).

Preemption often triggers dismissal due to the failure of the plaintiff to exhaust the available grievance procedures. *See Cotter v. Daimler Chrysler Corp.*, 87 FSupp2d 746, 752-53 (ED Mich 2000). It can also trigger dismissal due to the short six month statute of limitations for "hybrid" suits brought under § 301 alleging a breach of contract against the employer and breach of duty of fair representation against the union. *DelCostello v. Int'l Bhd. of Teamsters*, 462 US 151, 172 (1983); *see Connolly v. Boston Edison Co.*, 2001 WL 575868, * 8 (D Mass, May 15, 2001).

**B. <u>Analysis</u>**

The negotiation of the LCA was designed to resolve a grievance under the CBA concerning Schaeffner's allegedly positive drug test in late 2000. The LCA required Schaeffner to strictly comply with several conditions, including completion of a 60 month probationary period during which he agreed to be subject to periodic alcohol and drug testing and to "[m]aintain satisfactory job performance, conduct, and attendance." Schaeffner was terminated for violation of this provision in the LCA on July 30, 2003, two months after the CBA expired on May 31, 2003.

PTS does not argue that Schaeffner's claims are preempted because they require interpretation of the expired CBA, but instead argues that the LCA is a CBA. Because

Schaeffner's claims require interpretation of the LCA, PTS contends that they are preempted under § 301.

Even though Schaeffner was covered by a CBA, he "is permitted to assert legal rights *independent* of that agreement . . . so long as the contract relied upon is *not* a collective-bargaining agreement." *Catepillar, Inc.*, 482 US at 396. State law claims based on such an independent contract would not be preempted under § 301. *Id* at 394-95.

The LCA is an agreement which was executed independently of the CBA and does not even refer to the CBA. However, there is some authority for the proposition that last chance agreements are analyzed in the same manner as CBAs, and may be considered supplements to CBAs or CBAs themselves. Several circuits have held that arbitrators are required to enforce the terms of an LCA as superseding the CBA in order to reflect the parties' actual intentions which often impose higher standards on the employee than under the CBA. *See, e.g., Int'l Union of Operating Eng'rs Local 351 v. Cooper Natural Res., Inc.*, 163 F3d 916, 919-20 (5th Cir), *cert denied*, 528 US 812 (1999) (LCA "formed a binding contract pursuant to the CBA" and must be treated as a supplement to the CBA); *Coca-Cola Bottling Co. v. Teamsters Local Union No. 688*, 959 F2d 1438, 1440 (8th Cir), *cert denied* 506 US 1013 (1992); *Ohio Edison Co. v. Ohio Edison Joint Council*, 947 F2d 786 (6th Cir 1991); *Tootsie Roll Indus., Inc. v. Local Union No. 1, Bakery, Confectionary, and Tobacco Workers' Int'l Union*, 832 F2d 81, 84 (7th Cir 1987); *Bakers Union Factory No. 326 v. ITT Cont'l Baking Co, Inc.*, 749 F2d 350, 354-55 (6th Cir 1984). Other courts have held that state law claims by an employee arising out of the terms of an LCA are preempted by § 301. *Thomas v. LTV Corp.*, 39 F3d 611, 618 (5th Cir 1994) (an attendance probation agreement "technically qualifies as a CBA because it is a collectively-bargained

instrument, manifesting a disciplinary action"); *Connolly v. Boston Edison Co.*, 2001 WL

575868 (D Mass, May 15, 2001). *Also see Cotter v. DaimlerChrysler Corp.* 87 F Supp2d 746,

757 (ED Mich, March 7, 2001) (a Conditional Release Agreement must be interpreted in the

same manner as the CBA "since it is a negotiated agreement that supplements the CBA").

However, none of those cases involve a situation analogous to the one here. All of them

involved claims premised upon actions that took place before the relevant CBA had expired.

Here, in contrast, Schaeffner was terminated based on events that occurred two months after the

CBA expired, but before the expiration of the LCA. The LCA entitled Schaeffner to continued

employment, leading to regular non-probationary status at the conclusion of 60 months, provided

he adhered to the conditions of the LCA. Thus, the LCA covered a time period which extended

beyond that the term of the CBA. Moreover, the LCA does not specifically reference, nor does it

incorporate, the terms of the CBA. These distinguishing facts are critical to the analysis.

This court is aware of no case involving an LCA with a term extending beyond the term

of the underlying CBA and claims premised upon events transpiring after expiration of the CBA,

such as is involved here. This raises the question of the character of the relationship between the

employer and the employee under an LCA when the CBA expires.

Certainly where the Union negotiates an agreement on behalf of one of its members for

operative events which will take place prior to or concurrent with the terms of the CBA,

construing the LCA as a supplement to the CBA makes some sense. Allowing independent

claims based on those events would allow avoidance of CBA and frustrate the policies behind

federal preemption. No such danger exists here. In this case, Schaeffner has not attempted to

renege on his obligation imposed under the terms of the expired CBA, namely to arbitrate

employment disputes with PTS. Quite to the contrary, immediately upon his termination on July 30, 2003, the Union filed a grievance on his behalf. Goodman Depo, Ex 15. However, on December 19, 2003, the arbitrator agreed with PTS that the CBA had expired, and hence her jurisdiction over Schaeffner's claim under the LCA also expired. The arbitrator dismissed the arbitration because any rights Schaeffner had under the LCA were "rights accruing under a side agreement (LCA) with [PTS], not rights that accrued pursuant to the CBA." Arbitration Decision, p. 8. She further noted that Schaeffner could seek "vindication through court action for breach of contract." *Id* at 8.

As is evident by the Arbitration Decision, the Union had no role to play once the CBA expired and no forum in which to assert a claim on behalf of Schaeffner. The Union did not sign the LCA; the LCA did not reference the CBA; the CBA had expired; and an opportunity to grieve alleged breaches of the LCA no longer existed once the CBA expired.

However, PTS and Schaeffner both signed the LCA, remained in an employment relationship, and bound themselves to the terms worked out between them prior to expiration of the CBA. The LCA's term extended beyond the term of the CBA and included no reference to the CBA. In short, both at the time they executed the LCA and after the expiration of the CBA, Schaeffner and PTS reasonably expected their relationship to be governed by the terms of the LCA.

Under these circumstances, this court concludes that the LCA had a dual existence. While the CBA was in full force and effect, the LCA was a supplement to the CBA and had to be analyzed and processed in the same manner (*i.e.* through the grievance and arbitration process accorded under the terms of the CBA) as any other employment dispute governed by the CBA.

Had the alleged breach of the LCA taken place before the CBA expired, the Union would have been duty-bound to grieve that breach, just as it attempted to do in this case. However, once the CBA expired, the LCA stood on its own as an independent employment agreement between Schaeffner and PTS. At that point, the Union no longer represented Schaeffner and had no role to play in enforcement of any alleged breach of the LCA.

If the LCA is construed as a CBA after May 31, 2003, as urged by PTS, a practical problem arises under § 301 because the LCA contained no grievance or arbitration procedure. An "indispensable predicate" for a § 301 action against an employer based on a violation of a CBA is the union's breach of its duty of fair representation. *Daigle v. Gulf States Utilities Co., Local Union No. 2286*, 794 F2d 974, 977 (5th Cir), *cert denied*, 479 US 1008 (1986). Even if the employee sues only the employer, he still has to prove that the union breached its duty of fair representation by mishandling the grievance and arbitration proceedings. *DelCostello*, 462 US at 164. Therefore, to prevail on a claim against PTS for breach of the LCA, Schaeffner also would have to prove that the Union breached its duty of fair representation. Because the Union did what it could to present a grievance on Schaeffner's behalf, albeit unsuccessfully, it did not breach any duty of fair representation to Schaeffner because, in fact, it had none under the LCA after the CBA expired. In other words, the oddly-shaped peg of the LCA after the CBA expired simply does not fit into one of the uniformly-rounded holes of federal labor law jurisprudence.

To adopt PTS's position would place Schaeffner in a "Catch 22" situation by depriving him of any recourse to federal court for breach of contract, as well as any recourse to arbitration under the CBA. PTS could have written the LCA to terminate at the same time as the CBA then in place. It did not do so. PTS could have included a provision which eliminated any recourse

through the grievance and arbitration provisions of the CBA, or through other channels. It did

not do so. Finally, PTS could have extended the term of the CBA, thereby preventing the LCA

from standing in the twilight between CBA terms. It did not do that either. Given its failure to

take any of these courses of action, PTS may not now come to federal court and take advantage

of the predicament in which it has placed Schaeffner, namely precluding him from arbitrating his

dispute by the expiration of the CBA and also preventing from obtaining any remedy for PTS's

alleged breach of the LCA by the "mighty oak" of federal preemption. *See Golden State Transit

Corp. v. City of Los Angeles*, 475 US 608, 622 (1986) (REHNQUIST, J., dissenting).

      In the unusual circumstances presented here, this court concludes that insofar as its term

extended beyond the term of the CBA, the LCA stood on its own as an independent agreement

between Schaeffner and PTS. Because Schaeffner's state law claims rest on events that took

place after expiration of the PTS/Union CBA, their resolution does not require interpretation of a

CBA. Accordingly, to the degree defendants' Motion for Summary Judgment rests on the

argument that federal labor law preempts Schaeffner's claims, it should be denied.

## II. <u>First Claim for Relief (Breach of Contract)</u>

      Even if the First Claim of Relief for breach of contract is not pre-empted, PTS argues that

it is entitled to summary judgment because Schaeffner was an at-will employee whom PTS could

terminate for any reason.

      PTS relies on two cases in which plaintiffs alleged that terms in employment handbooks

modified their at-will employment status. In *Zacker v. North Tillamook County Hosp. Dist.*, 107

Or App 142, 145-46, 811 P2d 647, 649, *review denied*, 312 Or 151, 817 P2d 758 (1991), a

former hospital employee alleged that she could not be terminated at will, based on language in

the employee handbook that "involuntary termination *may* result in the final stage of the corrective discipline policy or because of gross misconduct." Because the employee handbook included permissive language, did not mandate a progressive disciplinary process, and included a provision which expressly stated that either the employee or the employer was privileged to terminate employment, the court found the employment to be at-will and affirmed the dismissal of plaintiff's claim for breach of contract.

In another case, the employee handbook set out certain penalties for breaking specified work rules, then stated: "Your cooperation in observing work rules will make it unnecessary for the Company to exercise any disciplinary action against you. The Company will determine whether there was cause for discipline or discharge. The Company will further determine what level of discipline will be enforced." *Carlson v. Crater Lake Lumber Co.*, 103 Or App 190, 197-98, 796 P2d 1216, 1221-22 (1990), *adhered to as modified on recon.*, 105 Or App 314, 804 P2d 511 (1991). Because the employee handbook did not say that a discharge could only be for cause and require a discharge to be based on misconduct, the court upheld summary judgment against the breach of contract claim.

Unlike those cases, Schaeffner's claim against PTS is not premised upon generic language eluding to a progressive discipline policy found in an employee handbook applicable to all employees. Instead, Schaeffner's claim is premised upon the language of the LCA, which is a contract expressly negotiated to resolve a preexisting grievance and which sets out the obligations of Schaeffner during a 60 month "probationary" period of re-employment. Schaeffner's obligation was to maintain "satisfactory job performance." Schaeffner Depo Ex 6, p. 1. PTS argues that this language simply put Schaeffner on notice that he could be terminated

if he did not live up to the requirements of the LCA. However, at-will employment does not require an employee to maintain satisfactory job performance; instead, at-will employment allows the employer to terminate an employee for any reason that is not illegal. The inescapable corollary to this language obliging Schaeffner to maintain satisfactory job performance is a corresponding obligation on PTS to continue employing Schaeffner if his performance was satisfactory. Absent any such obligation on PTS, this contractual language would be rendered mere surplusage.

PTS argues that Schaeffner concedes that he was a probationary employee, which is in effect a concession that he could be terminated at any time and for any reason. However, the testimony relied on by PTS for that argument is simply Schaeffner's understanding about what the CBA provided with respect to probationary employees. As explained above, the CBA expired two months before Schaeffner's termination. Thus, as of the date of Schaeffner's termination, the terms of the LCA, not the terms of the expired CBA, control.

Moreover, PTS did not fire Schaeffner because he was an at-will employee, but because he had violated the terms of the LCA to maintain satisfactory job performance. Goodman Depo Ex 14. By giving this as the reason for firing Schaeffner, PTS revealed that it, too, did not consider Schaeffner to be an at-will employee.

Because the LCA modified the terms of Schaeffner's employment, Schaeffner may pursue a claim for breach of contract against PTS based on the theory that his job performance continued to be satisfactory and PTS breached the LCA by nevertheless firing him. Accordingly, PTS's request for summary judgment against Schaeffner's First Claim for Relief should be denied.

## III.  Second Claim for Relief (Intentional Interference With Economic Relations)

Even if the Second Claim for Relief is not preempted, Goodman argues that Schaeffner cannot prove a *prima facie* case of intentional interference with economic relations sufficient to allow this claim to proceed.

A *prima facie* case of intentional interference with economic relations requires a showing of:

> (1) the existence of a professional or business relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*Kaelon v. USF Reddaway, Inc.*, 180 Or App 89, 96, 42 P3d 344, 347 (2002), citing *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841, 844 (1995).

To satisfy the third element in the "context of an interference claim when the plaintiff alleges that [his] corporate employer's agent interfered with [his] contractual relations with [his] employer," the plaintiff must show that "'the agent's sole purpose is one that is not for the benefit of the corporation.'"  *Id* at 96, 42 P3d at 348, quoting *Boers v. Payline Systems, Inc.*, 141 Or App 238, 242-43, 918 P2d 432, 435 (1996).

As noted in *Kaelon*, "the common thread" running through the cases allowing third-party claims to proceed is that "all involved incidents in which a supervisor, either allegedly or based on disputed evidence, retaliated for personal reasons against an employee for that employee's complaints about the defendant's wrongful conduct or that of another in the workplace."  *Id* at 100, 42 P3d at 349.  In this case, that common thread is missing.  Schaeffner relies exclusively

on Goodman's alleged lie that Schaeffner was sleeping on the job and his acknowledgment that telling lies would be a dereliction of his job duties.

Schaeffner speculates that Goodman wanted him fired because he was one of the more senior employees who would hold PTS strictly accountable to the terms of the CBA. Schaeffner Depo, pp. 111-13. Schaeffner was a Union shop steward until 2002. However, even if Goodman sought to terminate Schaeffner based on his past and potential future support for the Union, this reason is not a personal reason, but is related to the best interests of PTS and, thus, to Goodman's managerial duties. The fact that Schaeffner and Goodman were on opposite sides of disciplinary disputes during the course of the time Goodman supervised Schaeffner was part and parcel of their employment relationship.

Other than the cumulative effects of being on opposite sides of several disciplinary disputes, Schaeffner could identify nothing that would have motivated Goodman to retaliate against him based on a personal vendetta. *Id* at 112-13. He could not recall any issue placing him in conflict with Goodman after he stopped being shop steward. Prior to his termination for violating the drug policy, Schaeffner does not know of any purely personal issues involving himself and Goodman that were unrelated to PTS. Schaeffner is unaware of anything other than his Union shop activities or his stand on Union issues that would motivate Goodman to have a vendetta against him.

Absent any evidence that these run-of-the-mill disciplinary disputes turned personal, or that Goodman had other personal reasons for retaliating against Schaeffner by causing him to be fired, the record will not support a claim for intentional interference with contract or economic relations. In other words, the mere fact that Schaeffner lied does not prove that he was acting

contrary to his employer's interest and solely for personal reasons. Absent some other evidence, a jury would be left to speculate whether the lie was for personal reasons. Accordingly, Goodman should be granted summary judgment against Schaeffner's Second Claim for Relief due to the lack of evidence in the record to support a *prima facie* case.

## RECOMMENDATION

For the reasons stated above, defendants' Motion for Summary Judgment (docket #11) should be GRANTED in favor of Goodman as to the Second Claim for Relief (Intentional Interference with Contract / Economic Relations) and DENIED as to the First Claim for Relief (Breach of Contract). As a result, the First Claim for Relief would remain for trial.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due January 31, 2005. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 11th day of January, 2005.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge